UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RONALD PRATER,                    )
                                  )
          Plaintiff,              )
                                  )
     vs.                          )     Case No. 4:11CV399 CDP
                                  )
MICHAEL J. ASTRUE,                )
Commissioner of Social Security,  )
                                  )
          Defendant.              )

## MEMORANDUM AND ORDER

This is an action for judicial review of the Commissioner's decision denying Ronald Prater's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq.  Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's final determination. Prater alleges that he is disabled due to bilateral carpal tunnel syndrome.  Because I find that the decision denying benefits was not supported by substantial evidence, I will reverse the decision of the Commissioner.

## Procedural History

Prater protectively filed his application for benefits on March 21, 2008.  The claim was initially denied on May 21, 2008.  On September 18, 2008, following a hearing, an Administrative Law Judge denied Prater's claim.  On January 27, 2011,

the Appeals Council of the Social Security Administration denied Prater's request for review.  Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## Evidence Before the Administrative Law Judge

### Application for Benefits

In his application for benefits, Prater stated that he was born in 1954 and became disabled beginning on February 26, 2008.  In the disability report filed in connection with his claim, Prater alleged that he was unable to work because of "worn out hands, anxiety, and problems with left elbow."  Prater worked in Coca-Cola's warehouse for 35 years.  He stated that "my hands do not work any more and I cannot do my duties like I should be able to.  They hurt.  They are numb . . . ."  He also complained of a pinched nerve in his neck.

### Medical Records

Prater first complained of numbness and tingling in both hands in 2003.  He was referred to Mark Keohane, M.D., an orthopedic surgeon, who performed right carpal tunnel release surgery in May of 2003.[1]

In July and August of 2005, Prater was seen by Richard E. Coin, M.D., to

---

[1]Prater had left carpal tunnel release surgery in 2005, but there are no medical records in the file relating to the second surgery.

assess his bilateral hand complaints.  Dr. Coin's examination revealed some

discomfort over the carpal tunnels and equivocal Tinel's sign.  Dr. Coin indicated

that his examination was consistent with left carpal tunnel syndrome and right

recurrent carpal tunnel syndrome.   Dr. Coin attributed Prater's diagnosis to his

"30+ years of hand-manipulative duties at Coca-Cola Enterprises."  Dr. Coin

opined that Prater was a candidate for a left carpal tunnel release and a recurrent

right carpal tunnel release, but determined that he was "fit to proceed with regular

duties without restriction."

Prater was next seen by Robert P. Poetz, D.O., a doctor of osteopathic

medicine, on April 4, 2007 for work-related injuries.  Prater complained that his

hands were cold and numb and that he lacked control and grip strength.  He also

said that his hands kept him awake at night.  During his physical examination of

Prater, Dr. Poetz noted decreased pin prick sensation along the median nerve

distributed bilaterally, positive Phalen's test[2] and Tinel's sign[3] bilaterally, and

decreased grip strength at 3/5 bilaterally.  Prater had good range of motion in his

cervical, thoracic, and lumbar spine, and his straight leg raising tests in the seated

---

[2]A reproduction of tingling with wrist flexion, suggestive of carpal tunnel syndrome.  <u>See</u> <u>The Merck Manual of Diagnosis and Therapy</u> 334-35 (18th ed. 2006).

[3]Tinel's sign refers to distal tingling that occurs in response to tapping or palpation and may be a sign of nerve compression.  <u>See</u> <u>The Merck Manual of Diagnosis and Therapy</u> 334, 335, 339 (18th ed. 2006).

and supine positions were negative.  Dr. Poetz diagnosed Prater with right carpal tunnel syndrome and status post right carpal tunnel release from May of 2003, as well as left carpal tunnel syndrome and status post left carpal tunnel release from October of 2003.  Dr. Poetz characterized Prater's prognosis as "guarded" and recommended that he wear wrist splints, avoid heavy lifting and strenuous activity, avoid pushing and pulling, avoid excessive and repetitive use of upper extremities, avoid use of equipment that creates torque, vibration, or impact to the upper extremities, avoid any activities that exacerbate his symptoms, and undergo a comparative EMG nerve conduction study, "followed by additional surgery if indicated."  Dr. Poetz rated Prater's permanent partial disability in the upper right extremity as 45% and 35% in the upper left extremity.

Prater saw his primary care physician, Shobha Dixit, M.D., for healthcare services unrelated to his disability claim[4] between March 2007 and March 2008. Before Dr. Dixit, Dr. Laughton was Prater's primary care physician.  On March 27, 2007, Prater saw Dr. Laughton for pain and numbness from carpal tunnel syndrome.  Dr. Laughton prescribed Lyrica.[5]  On February 28, 2008, Prater complained to Dr. Dixit that he could not sleep due to the pain in his hands, so Dr.

---

[4]These included abdominal and side pain, tooth pain, chest pain, and cracked ribs.

[5]Lyrica is an anticonvulsant indicated for the treatment of neuropathic pain.  See Nokes v. Astrue, 2012 WL 171279, *3 n.6 (E.D. Mo. Jan. 20, 2012).

Dixit referred Prater to Dr. Keohane for further evaluation.

On March 3, 2008, Prater saw Dr. Keohane for bilateral wrist pain.  Prater reported ongoing, intermittent pain since his last carpal tunnel surgery and that this pain had gotten "much worse in the last couple of months."  Prater told Dr. Keohane that he believed the problem was a recurrence of his carpal tunnel syndrome.  Dr. Keohane noted a positive Tinel and paresthesias in the thumb, index, and long finger of both wrists, but he observed that Prater's wrist scars had healed well.  Dr. Keohane's impression was probable recurrent carpal tunnel.  He told Prater to get a nerve conduction study and have an evaluation with Dr. Simowitz.  Dr. Koehane believed that repeat operative care would be necessary, and he stated that "it is reasonable [for Prater] to stay off work until his symptoms are appropriately managed."

Dr. Frederic Simowitz performed an electromyography (EMG) study on March 6, 2008 and found that the results for both arms and hands were normal, including "muscles served by anterior interosseus branch of median nerve bilaterally."  Dr. Simowitz also noted an isolated finding of marginally prolonged distal ulnar sensory latency at left Guyon's canal.

Prater was evaluated about a week later by Min Pan, M.D., for bilateral hand and arm pain.  Prater reported to Dr. Pan that he had noticed improvement in his

symptoms by wearing a wrist splint.  Dr. Pan's examination revealed normal motor strength in all extremities and no gait difficulty.  Prater's reaction to pinprick, temperature, and vibration sensation in all extremities was normal.  Dr. Pan recommended increasing Prater's Lyrica prescription to 100 mg three times a day and referred Prater for a magnetic resonance imaging (MRI) of the cervical spine.

An MRI of Prater's cervical spine was taken on March 20, 2008 and revealed a small central disc protrusion at C4/5 superimposed on diffuse disc bulging and uncovertebral osteoarthritis, both of which caused diffuse narrowing of the vertebral canal, though no overt stenosis, with the small disc protrusion causing a mild but definite impression on the thecal sac.  At C5/6, the MRI showed "severe disc degeneration, with disc bulging and uncovertebral osteoarthritis causing diffuse narrowing of the vertebral canal, though without overt stenosis.  In addition, there is a subtle, mostly left-sided broad-based disc protrusion or pseudobulging is supported by minimal forward subluxation of C6 under C5, probably by no more than 2 mm."  At C6/7, the MRI revealed a "broad left paracentral disc protrusion, with mild but definitive impression on the thecal sac, extending into the origin of the left intervertebral neural foramen which is mildly narrowed as a result."

Prater saw Dr. Pan for a follow-up visit on April 16, 2008.  Dr. Pan noted

that Prater's EMG and nerve conduction study did not show evidence of bilateral upper extremity entrapment neuropathy and that his MRI revealed degenerative joint disease with no spinal stenosis or large herniated disc.  Prater reported to Dr. Pan that he was not working and had applied for disability.  During his examination, Dr. Pan found that Prater had normal motor strength, tandem walk and sensory reflexes, but a mild tremor in his upper extremities.  Because the MRI could not explain Prater's symptoms of bilateral hand and arm pain, Dr. Pan referred Prater to the Washington University Neuromuscular Clinic for a second opinion.[6]  Dr. Pan also believed a repeat EMG and nerve conduction study might be necessary.  He told Prater to continue wearing his wrist splints and taking Lyrica three times daily.

Although neither party discusses it, the record also contains a physical residual functional capacity assessment from Nancy Dunlap, a medical consultant, on May 21, 2008.  Ms. Dunlap lists Prater's primary diagnosis as degenerative disc disease and his secondary diagnosis as carpal tunnel syndrome.  She found that Prater could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about six hours in an eight hour work day, but that he was limited in his

---

[6]The Court has no information about whether that visit took place, and if so, the results of that visit.

pushing and pulling activities in his upper extremities and that he had to alternate

between sitting and standing to alleviate pain.  She stated that Prater should never

climb a ladder, rope, or scaffolds, and that he had limited ability to handle and feel

objects.  Ms. Dunlap noted that Prater had a history of carpal tunnel surgery with

continuing pain, positive Tinel's sign, with parasthesias in thumb, index finger, and

both wrists as found by Dr. Koehane.  She also noted the MRI findings of

degenerative disc disease without severe spinal stenosis or large herniated disc, and

that he has not seen much improvement with his increased medication.

<u>Testimony</u>

A hearing before an ALJ was held on Prater's disability claim on September

2, 2008.  Prater testified and was represented by counsel.  Prater told the ALJ that

he graduated from high school, had no vocational or technical training, no

experience in retail or sales, and had never served in the military or been self-

employed.  Prater worked in the warehouse for Coca-Cola, where his job involved

opening and filling $CO_2$ tanks that weighed between 20 and 55 pounds.  He

testified that he opened and closed the $CO_2$ valves about 130 times per day.  When

the ALJ asked him when he was planning on attending vocational rehabilitation,

Prater responded, "After this date."  During the examination of Prater, the ALJ

held the following exchange with counsel on the record:

ALJ: Counsel, you must establish that the claimant has a diagnosed physical impairment.  What is the claimant's diagnosed physical impairment?

ATTY: The bilateral carpal tunnel which has been chronic in nature, unresolved with surgery.

ALJ: And how do we know that, Counsel?

ATTY: Medical records, your honor.

ALJ: Well, I'm looking at 4-F.  And that doctor states that the EMG study, which is what would have been used to diagnose the carpal tunnel, is negative.

ATTY: Yes, your honor.

ALJ: So you don't have a diagnosed physical impairment there because the EMG came up negative.

ATTY: Yes, your honor, but I believe medical testimony would support that an EMG in and of itself, just because it's negative, is not conclusive as to whether or not an individual still has carpal tunnel.  And the records from Dr. Poetz also indicate this recurrent carpal tunnel syndrome.

ALJ: That is based on the claimant's reports?

ATTY: Yes, ma'am.

ALJ: Ok.  But we have to have objective medical evidence at step two in order to establish that the claimant even has an impairment to begin with.  This claimant has been through carpal tunnel surgery and returned to work.  They just got through doing an EMG study on it that came up negative.  Now, the claimant's testimony cannot establish an impairment.

ATTY: Yes, your honor.  My statement previously is that doctor's

testimony, if we took depositions in Social Security hearings, would be that EMG in and of themselves are not conclusive as to whether or not a patient has carpal tunnel.  There's false positives on EMGs.

ALJ: Has he had another EMG test done?  No, he hasn't, Counsel, not according to the records that we have here.

ATTY: That's correct.  The most recent one was in 2008.

ALJ: How many times has the claimant seen Dr. Poetz?

ATTY: One time.

ALJ: That's it?

ATTY: Yes.  It was for an evaluation for disability.  And further treatment was recommended in his notes, along with restrictions.

ALJ: That was almost a year and a half ago.

ATTY: Yes, ma'am.  And the claimant would testify that after he returned to work, that the conditions of carpal tunnel in both hands have progressed.

ALJ: Well, we have more up-to-date medical records.

ATTY: That is correct.

ALJ: That we will now rely on . . . .

During questioning about his daily activities, Prater testified that he typically gets up at about 5:00 a.m., drinks coffee, cooks breakfast, cleans the house, bathes, and then watches television.  Sometimes he cooks dinner for his wife, performs basic household maintenance chores, naps, or mows the lawn.  However, he later stated

- 10 -

that he has difficulty performing these tasks, and that he has problems grasping silverware and other objects in his hands.  Prater does his own laundry and goes shopping with his wife.  He visits with friends or family if they come to see him, and occasionally he goes fishing.  Prater changes the oil in his truck.  Prater testified that he could stand "as long as I need to," could walk "as far as I need to," and could sit all day.  Prater said that his hands limit his ability to lift things, and that he can lift 20-25 pounds.  In an attempt to relieve the pain in his hands, Prater wears splints on his wrists, soaks his hands in warm water, limits the use of his hands, and massages or rubs Bengay on them.  He also takes Lyrica for pain but testified that he has had difficulty affording the medication since he no longer has insurance coverage through Coca-Cola.  Prater has difficulty sleeping and wakes up throughout the night.

## **Legal Standard**

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001).  Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion.  Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000).  As long as there is substantial evidence on the record as a whole to support

the Commissioner's decision, a court may not reverse it because substantial

evidence exists in the record that would have supported a contrary outcome, id., or

because the court would have decided the case differently.  Browning v. Sullivan,

958 F.2d 817, 822 (8th Cir. 1992).  In determining whether existing evidence is

substantial, a court considers "evidence that detracts from the Commissioner's

decision as well as evidence that supports it."  Singh v. Apfel, 222 F.3d 448, 451

(8th Cir. 2000) (quoting Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999)).

Where the Commissioner's findings represent one of two inconsistent conclusions

that may reasonably be drawn from the evidence, however, those findings are

supported by substantial evidence.  Pearsall v. Massanari, 274 F.3d 1211, 1217

(8th Cir. 2001) (internal citation omitted).

To determine whether the decision is supported by substantial evidence, the

Court is required to review the administrative record as a whole and to consider:

(1) the credibility findings made by the Administrative Law Judge;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and non-exertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

Brand v. Secretary of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a). In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity. If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix

- 13 -

1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work. If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, the Commissioner declares the claimant disabled. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence. Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. See e.g., Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), which include:

> the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and

aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions.

Id. at 1322.  When an ALJ explicitly finds that the claimant's testimony is not credible and gives good reasons for the findings, the court will usually defer to the ALJ's finding.  Casey v. Astrue 503 F.3d 687, 696 (8th Cir. 2007).  The ALJ retains the responsibility of developing a full and fair record in the non-adversarial administrative proceeding.  Hildebrand v. Barnhart, 302 F.3d 836, 838 (8th Cir. 2002).

## The ALJ's Findings

The ALJ denied Prater's claim for benefits about two weeks after the hearing in a written decision dated September 18, 2008.  Although she found that Prater had the medically determinable impairments of residuals from carpal tunnel surgeries on both wrists and degenerative disc disease of the cervical spine, the ALJ terminated the analysis at step two because she concluded that Prater did not have a severe impairment or combination of impairments.  In deciding that Prater did not suffer from any severe impairments, the ALJ stated that she considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . ."  The ALJ found that Prater's medically determinable impairments "could have been reasonably expected to produce some symptoms; however, the claimant's

statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with finding that the claimant has no severe impairment or combination of impairments . . . ."  To conclude that Prater had no impairment causing functional limitations lasting twelve consecutive months, the ALJ relied on Dr. Coin's 2005 report that Prater could return to work at Coca-Cola without restrictions.  However, she discounted Dr. Poetz' 2007 report because "this evaluation is over one year old" and Prater had gone back to work during the pendency of his worker's compensation claim. The ALJ also found that "there are no complaints in the records from the claimant's current primary care provider, Shobha Dixit, M.D., until February 28, 2008."  The ALJ discounted Prater's complaints of pain because "there were no complaints of pain that precluded the claimant from working aside from medical consultations for carpal tunnel syndrome for the claimant's ongoing Workers Compensation litigation."  Although acknowledging Prater's strong work record, the ALJ nevertheless concluded that Prater's testimony "indicates a strong motivation for secondary gain" because he testified "he was waiting for the resolution of his disability claim before he tried to get vocational training" and performed most household chores.

The AlJ gave controlling weight to the assessment of Prater's treating

physician, David Brown, M.D., who performed Prater's second surgery in 2005

and released him to return to work,[7] and Dr. Coin's 2005 assessment.  The ALJ

refused to give Dr. Poetz' assessment any significant weight "as it was performed

solely for the claimant's litigation at the request of the claimant's counsel" and "he

is the only doctor of any treating or examining doctor who reported any strength

abnormalities."  In contrast, the ALJ characterized Dr. Coin's evaluation as "much

different in tone, [] neutral in content," and "consistent with the other evaluations."

The ALJ concluded as follows:

> In sum, the conclusion that the claimant has not had an impairment or
> combination of impairments that significantly limits his ability to
> perform basic work activities for twelve consecutive months is
> supported by records showing two separate physicians released him
> for full duties at a job between heavy and medium exertional work.
> The claimant testified he had no trouble standing, walking, or sitting,
> only using his hands.  He returned to work for well over a year and
> did not begin to complain of more problems until his Workers
> Compensation case neared finalization.  After working at a heavy to
> medium job for an extended period after his surgeries, there is no
> indication the claimant's current limitations have lasted twelve
> consecutive months as they only began in February of this year.  This
> is especially true since every recent treating and examining doctor has
> found no clinical signs or laboratory tests that support the claimant's
> allegations except for the report of a positive Tinel's sign by Dr.
> Koehane.

---

[7] Dr. Brown's records are not in the file.  Although defendant cites pages 182-83 as Dr.
Brown's opinion, these pages are actually part of Dr. Poetz' report and include his summary of
Dr. Brown's report, not Dr. Brown's actual report.

The claimant has failed to demonstrate his impairment has lasted or will be expected to last twelve consecutive months while resulting in functional limitations to his ability to perform work activities or precluding all employment.  Not only did he work until February 28, 2008, at least, but he recovered from prior surgeries and returned to work.  There is no objective medical evidence that the same result would not occur after the additional evaluations recommended by both Dr. Koehane and Dr. Pan, none of which the claimant has undergone.

### Discussion

Prater argues that the ALJ erred by not finding his complaints of the residuals of carpal tunnel surgery in both wrists and degenerative disc disease as severe impairments at step two of her analysis.   At step two of the sequential evaluation process, an ALJ determines the medical severity of a claimant's impairments.  See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  A severe impairment is one which significantly limits a claimant's physical or mental ability to perform basic work activities.  20 C.F.R. § 404.1520(c).  "The impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques.  A physical . . . impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by the claimant's statement of symptoms."  Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (quoting 20 C.F.R. § 404.1508).  Although Prater has "the burden of showing a severe impairment that significantly limited her physical or mental ability to perform

basic work activities, . . . the burden of a claimant at this stage of the analysis is not great." Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks and citations omitted).

Here, the ALJ erred in terminating the analysis at step two by finding that Prater did not suffer from a severe impairment because he was released to return to work three years before the onset date of his alleged disability.   The ALJ discounted Dr. Poetz' findings that Prater had recurrent carpal tunnel syndrome in 2007 and may need additional surgery because the evaluation was "over a year old," yet she relied instead on the much older report of Dr. Coin, who cleared Prater to return to work in 2005 after his second surgery.  In doing so, the ALJ clearly erred.   "'It is the ALJ's function to resolve conflicts among the various treating and examining physicians.'"  Tindell v. Barnhart, 444 F.3d 1002, 1006 (8th Cir. 2006) (quoting Vandenboom v. Barnhart, 421 F.3d 745, 749-50 (8th Cir. 2005) (internal marks omitted)).  Here, however, there is no evidence indicating that Dr. Poetz' opinion even conflicted with that of Dr. Coin's, since they were rendered two years apart and the records make clear that Dr. Poetz diagnosed a

recurrence of Prater's carpal tunnel syndrome that was treated surgically in 2003 and 2005.[8]

There is no evidence in this record, let alone the required substantial evidence of record, to support the ALJ's conclusion that Prater's recurrence of carpal tunnel syndrome was not a severe impairment or would not be expected to last 12 consecutive months simply because he was able to return to work after his first set of surgeries ending in 2005.  Instead, the objective medical evidence of record suggests that Prater was suffering from recurrent bilateral carpal tunnel syndrome, in pain, had difficulty using his hands, and that he may need additional surgery.  In 2007, Dr. Poetz noted decreased pin prick sensation along the median nerve distributed bilaterally, positive Phalen's test and Tinel's signs bilaterally, and decreased grip strength at 3/5 bilaterally.  Dr. Poetz diagnosed Prater with right carpal tunnel syndrome and status post right carpal tunnel release from May of 2003, as well as left carpal tunnel syndrome and status post left carpal tunnel release from October of 2003.  Dr. Poetz characterized Prater's prognosis as "guarded" and recommended that he wear wrist splints, avoid heavy lifting and

---

[8]Additionally, the ALJ's conclusion that Dr. Coin's opinion should be afforded more weight than Dr. Poetz' opinion because Dr. Poetz' examination was performed "solely for the claimant's litigation" is not supported by substantial evidence because Dr. Coin was also an independent medical examiner who evaluated Prater  to determine his "work status and to assess whether or not the patient was at maximum medical improvement" in connection with his ongoing workers compensation litigation.

strenuous activity, avoid pushing and pulling, avoid excessive and repetitive use of upper extremities, avoid use of equipment that creates torque, vibration, or impact to the upper extremities, avoid any activities that exacerbate his symptoms, and undergo a comparative EMG nerve conduction study, "followed by additional surgery if indicated."  In March of 2008, Dr. Koehane, the surgeon who performed Prater's 2003 surgery, also diagnosed Prater with "probable recurrent carpal tunnel" after noting a positive Tinel and paresthesias in the thumb, index, and long finger of both wrists.  Dr. Koehane believed that repeat operative care would be necessary, and he stated that "it is reasonable [for Prater] to stay off work until his symptoms are appropriately managed."

At the hearing and in her decision, the ALJ made much of the fact that Prater's subsequent EMG and nerve conduction study did not show evidence of bilateral upper extremity entrapment neuropathy.  Yet, there is no evidence in the record to suggest that positive EMG results are required for a diagnosis of carpal tunnel syndrome.  Here, the objective and diagnostic testing of both Dr. Poetz and Dr. Koehane indicated recurrence of carpal tunnel syndrome.  Dr. Pan, who treated Prater for arm and hand pain following the 2008 EMG and MRI, referred Prater to the Washington University Neuromuscular Clinic for a second opinion and believed a repeat EMG and nerve conduction study might be necessary.  The ALJ

points out in her decision that these follow-up tests and visits were not done, but there is no evidence in the record explaining why this had not taken place.[9]  The ALJ retains the responsibility of developing a full and fair record in the non-adversarial administrative proceeding.  Hildebrand, 302 F.3d at 838.  If the results of a repeat EMG and nerve conduction study or the opinion of a specialist clinic were required to decide Prater's disability claim, then she should have ordered the appropriate testing or permitted Prater to supplement the record with this information.  I note, too, that Prater changed attorneys during the pendency of the administrative process, and his new counsel was not notified of the adverse determination.  Although counsel attempted to provide additional information to the Appeals Council, that information was apparently not considered.  However, on remand the ALJ remains free to consider any additional evidence offered by Prater and to order any testing or consultations necessary for proper evaluation of his claim.

Here, the ALJ determined, without any supporting medical evidence, that Prater's impairments were not severe merely because he was able to return to work after his surgery in 2005.  Yet there is nothing in the record to support her

---

[9]For example, the ALJ did not question Prater about these follow-up visits to determine whether he was choosing not to seek additional treatment, whether he could not afford to do so, or whether he had scheduled an appointment but it had not taken place before the September hearing.

conclusion that Prater's treatment and prognosis for recurrent carpal tunnel
syndrome would necessarily be the same as his treatment and prognosis for carpal
tunnel syndrome, or that it would last the same duration.  Here, two treating
physicians and one consulting, examining physician all diagnosed Prater with
probable recurrent carpal tunnel syndrome.  Their diagnoses were supported by
objective diagnostic testing, not merely Prater's statement of symptoms.  The ALJ
is not free to substitute her own medical opinion for that of a physician.  Ness v.
Sullivan, 904 F.2d 432, 435 (8th Cir. 1990).   In doing so, she erred.  The ALJ also
failed to consider whether Prater's degenerative disc disease in combination with
his bilateral carpal tunnel syndrome constituted a severe impairment.  Because the
ALJ improperly disregarded the evidence of Prater's impairments and terminated
the analysis at step two, substantial evidence as a whole does not support the ALJ's
decision and the matter must be remanded.

On remand the ALJ should consider all of the relevant evidence in making a
determination of the severity of Prater's impairments, including an evaluation of
any additional evidence, testing or consultative examinations that may be required.
This includes a reevaluation of Prater's credibility under the standards set forth in
Polaski, 739 F.2d 1320.  Although the ALJ may discount a claimant's subjective
complaints, she may not do so on the sole ground that those complaints are not

fully supported by the objective medical evidence.  Jeffery v. Secretary of Health
& Human Servs., 849 F.2d 1129, 1132 (8th Cir. 1988).  The ALJ may, however,
disbelieve a claimant's subjective complaints when they are inconsistent with the
record as a whole.  Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); Spradling v.
Chater, 126 F.3d 1072, 1075 (8th Cir. 1997).  Thus, in assessing subjective
allegations, the ALJ may consider the frequency and type of the claimant's
medication or treatment, the claimant's daily activities, and the claimant's
appearance and demeanor at the hearing.  Jones v. Chater, 86 F.3d 823, 826 (8th
Cir. 1996); Cruse v. Bowen, 867 F.2d 1183, 1186 (8th Cir. 1989).  When rejecting
a claimant's subjective complaints, the ALJ must make an express credibility
determination using the factors set forth in Polaski.  Baker v. Apfel, 159 F.3d 1140,
1144 (8th Cir. 1998); Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991).  It is not
enough that the record contains inconsistencies; the ALJ must specifically
demonstrate that he considered the relevant evidence.  Jeffery, 849 F.2d at 1132;
Butler v. Secretary of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988).

        Here, the ALJ concluded that Prater's testimony "indicates a strong
motivation for secondary gain" because he testified "he was waiting for the
resolution of his disability claim before he tried to get vocational training" and
performed most household chores.  Credibility determinations, when adequately

explained and supported, are for the ALJ to make.  <u>Lowe v. Apfel</u>, 226 F.3d 969, 972 (8th Cir. 2000).  However, it appears the ALJ may have mischaracterized Prater's testimony in reaching this conclusion.  When the ALJ asked him when he was planning on attending vocational rehabilitation, Prater only responded, "After this date."  Whether this response was meant as interpreted is unclear from the record, but given Prater's long work history and the somewhat combative nature of the ALJ's questioning of Prater and his attorney, on remand this issue should be addressed in greater detail so that the record is clear.  In light of remand, the ALJ should develop these and any other facts as needed to make a credibility determination based on a full and fair record.

## Conclusion

Because substantial evidence in the record as a whole does not support the ALJ's decision, this matter is remanded to the Commissioner for a consideration of Prater's claim in light of all medical records on file and development of any additional facts as needed.  The Commissioner should reevaluate Prater's impairments and complaints in accordance with <u>Polaski</u> and order additional consultative examinations, if necessary.

Therefore, I reverse and remand pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this order.  <u>See</u> <u>Buckner v. Apfel</u>,

213 F.3d 1006, 1010 (8th Cir. 2000) (finding that remand under sentence four of

42 U.S.C. section 405(g) is proper when the apparent purpose of the remand was to

prompt additional fact-finding and further evaluation of existing facts).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is

reversed and the case is remanded to the Commissioner pursuant to sentence four

of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum

and Order.

A separate Judgment in accord with this Memorandum and Order is entered

this date.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 13th  day of February, 2012.